NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM DENTON, JR., | : |
| | : Civil Action No. 13-CV-7200 (SDW) |
| Petitioner, | : |
| | : |
| v. | : **OPINION** |
| | : |
| COMMISSIONER OF | : |
| SOCIAL SECURITY, et al., | : |
| | : November 5, 2014 |
| Respondents. | : |

**WIGENTON**, District Judge.

Before this Court is Plaintiff William Denton Jr.'s ("Plaintiff") appeal on the final administrative decision of the Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Joel Friedman's ("ALJ Friedman") denial of Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and XVI, respectively, of the Social Security Act (the "Act"). Plaintiff, pursuant to 42 U.S.C. § 405(g), seeks review of the Commissioner's determination, which denied Plaintiff's applications for DIB and SSI under the Act.

This Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Venue is proper under 28 U.S.C. § 1391(b). This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78.

For the reasons set forth herein, this Court will **REMAND** this matter.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff was 49 years old when ALJ Friedman issued a decision on June 29, 2012. (*See* R. 110, 181, 188.)   He is a high school graduate. (R. 214.)  Plaintiff was previously employed as a pressman, a journeyman/construction worker, bag machine adjuster, and helper. (R. 215.) He last worked on June 6, 2008. (R. 213.)

   A. **Medical History and Background**

On June 4, 2008, Plaintiff crashed his truck into the side of a house while working. (R 287-314). Plaintiff claims that the accident occurred because he had a seizure, and that he could not recall events that occurred right before and after the accident. (R. 287, 312.) As a result of the accident, Plaintiff claims that he suffers from left knee and hip pain. He was treated in the emergency room of the Raritan Bay Medical Center and received X-rays of his left knee, spine, chest, and head. (R. 287-313.) X-rays of Plaintiff's left knee, chest, and head revealed no abnormalities. (R. 301, 305, 307.) However, a CT scan of Plaintiff's cervical spine revealed a degenerative disc disease and moderate spondylosis (degeneration) throughout the mid cervical region. (R. 302-03.)

Dr. Jeffrey Bechler ("Dr. Bechler"), an orthopedic surgeon, treated Plaintiff's left knee from September 2008 through August 2009. (R. 314-35.) On September 11, 2008, Dr. Bechler observed that Plaintiff had a limited range of motion in his left knee with mild medical joint line crepitus,[1] mild patellar femoral joint crepitus, and mild anterior medial joint line tenderness. (R. 315.) X-rays of Plaintiff's left knee revealed degenerative joint disease of the medial compartment. (*Id.*) On September 25, 2008, Dr. Bechler observed that the Plaintiff's quadriceps were operating at reduced strength. (R. 319.) Additionally, an MRI of Plaintiff's left knee

---

[1] "A clinical sign in medicine that is characterized by a peculiar crackling, crinkly, or grating feeling or sound under the skin, around the lungs, or in the joints." http://www.medterms.com/script/main/art.asp?articlekey=13959 (last visited Sept. 15, 2014).

2

revealed a grade III lesion in the posterior one-third of the medial meniscus. (*Id.*) On April 14, 2009, X-rays of Plaintiff's left knee revealed moderate degenerative joint disease of the patellofemoral joint and joint disease in the medial compartment. (R. 324.) On June 17, 2009, Dr. Bechler performed arthroscopic partial medial meniscectomy on Plaintiff's left knee. (R. 327-28.) On August 27, 2009, Dr. Belcher reported that Plaintiff had a ninety percent (90%) improvement in his left knee. (R. 334.) He also reported that Plaintiff no longer has pain to the inside of the knee and only experiences pain under the kneecap when he is going up stairs. (R. 334.) According to Dr. Bechler's assessment, Plaintiff reached maximum medical improvement and could return to work with no restrictions. (R. 324-25.)

On May 27, 2010, Dr. Rashel Potashnik ("Dr. Potashnik"), a consultative physician, examined Plaintiff. (R. 402.) Dr. Potashnik assessed that Plaintiff was limited in activities requiring prolonged weight bearing, gross manipulations of the arm, lifting, carrying, and reaching. (R. 403.) Dr. Potashnik noted that Plaintiff walked with a left limp, could not squat, and could not walk on his heels nor on his tiptoes. (*Id.*) During the examination, Dr. Potashnik observed that Plaintiff's lumbar spine exhibited a limited range of motion and tenderness. (*Id.*) Plaintiff's left arm demonstrated a muscle strength grade of three out of five $(3/5)^2$ with tenderness and a limited range of motion. (*Id.*) Plaintiff's left knee exhibited effusion with tenderness and a limited range of motion. (*Id.*) Plaintiff's left quad muscle strength grade was four out of five (4/5) because of knee pain. (*Id.*) Plaintiff independently changed for the examination and was able to get on and off the examination table on his own. (*Id.*)

On June 2, 2010, Dr. David Schneider ("Dr. Schneider"), a State agency medical consultant, reviewed Plaintiff's medical history and concluded that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. (R. 103.) During an eight-hour

---

[2] On the passive range of motion chart "five" (5) represents full strength.

workday, Plaintiff could sit up to six hours and stand or walk for up to four hours with normal breaks. (*Id.*) He could climb ramps/stairs, balance, stoop, or crouch. (*Id.*) He can occasionally kneel and/or crawl and push and/or pull with his left leg. Plaintiff could not push nor pull with his left arm and could not climb ladders, ropes, or scaffolds. (*Id.*) Dr. Schneider concluded that Plaintiff should avoid concentrated exposure to vibrations and moderate his exposure to hazards. (R. 104.)

On August 19, 2010, Plaintiff was treated in the emergency room of Robert Wood Johnson University Hospital-Rahway following a seizure. (R. 514.) Plaintiff was prescribed bed rest and Dilantin twice daily. (R. 517.) It was reported that Plaintiff was a non-smoker, non-alcoholic, and not a drug user. (R. 516-517.) On August 20, 2010, Plaintiff was discharged from the hospital. (R. 515.) On July 8, 2011, Plaintiff was again treated in the emergency room of Robert Wood Johnson University Hospital-Rahway following a seizure that lasted about five minutes. (R. 590.) According to hospital records, Plaintiff was hypoglycemic and heavy alcohol intake was noted. (*Id.*) He was treated with Dilantin and released four days later. (*Id.*)

On January 25, 2012, Dr. Peter Crain ("Dr. Crain") indicated that Plaintiff has seizures once every three months. (R. 499.) Plaintiff reported that he has become more forgetful, which was consistent with Dr. Crain's findings of a concussional syndrome. (*Id.*) Taking into account the combination of orthopedic and neuropsychiatric pathologies, Dr. Crain concluded that Plaintiff was one hundred percent (100%) totally disabled. (*Id.*)

On February 1, 2012, Dr. Becan, who also examined Plaintiff, reported that Plaintiff was disabled due to spine and left shoulder impairments. (R. 644-47.) Dr. Becan reported a "40% partial total" for Plaintiff's cervical spine "due to the residuals of a chronic post-traumatic cervical strain and sprain with bilateral cervical radiculitis." (R. 646.) Additionally, Plaintiff's

left shoulder displayed "95% of partial total due to residuals of a rotator cuff tendinopathy and biceps tendinopathy with the development of frozen left shoulder . . . ." (*Id*.) Plaintiff informed Dr. Becan that he had difficulty performing household chores such as dishwashing, cleaning, mowing the lawn, doing laundry, and shopping. (R. 638.) He admitted to tobacco use of two packs per day and daily alcohol use. (R. 639.)

On March 15, 2012, Dr. Sukhjender Goraya ("Dr. Goraya") wrote a letter indicating that Plaintiff was totally disabled because he still suffered from soreness in his left knee. (R. 650.) As a result of this soreness, Plaintiff has difficulty walking approximately 300 feet before experiencing knee pain and is unable to kneel, squat, or climb stairs. (R. 654.)

### B. Summary of Psychological Assessments

On April 27, 2010, at the request of the State, Dr. Jack Baharlias ("Dr. Baharlias"), a consultative psychologist, evaluated Plaintiff. (R. 399-401.) Plaintiff told Dr. Baharlias that he was not taking his medication and that he consumed three to four beers a day. (R. 399-400.) During examination, Dr. Baharlias observed that the Plaintiff was cooperative, fully oriented, and serious. (R. 400.) He also noted that Plaintiff was somewhat anxious and fearful. (*Id*.) Plaintiff spoke spontaneously with adequate volume and rate, and his thought content was goal directed with no disorder. (*Id*.) Plaintiff acknowledged suicidal ideation with no intent to act, paranoid ideation, and racing thoughts. (*Id*.) On the DSM-IV multiaxial scale,[3] Dr. Baharlias assessed depressive disorder associated with the general medical condition, and seizure disorder, and determined that Plaintiff had a global assessment of functioning ("GAF") score of fifty-five out of sixty (55/60). (R. 401.)

---

[3] The DSM- IV multiaxial scale assesses an individual's mental and physical condition. *Diagnostic and Statistical Manual of Mental Disorders-IV-TR*, Front Matter, Multiaxial Assessment (2000).

On May 11, 2010, Dr. Michael Britton ("Dr. Britton"), a State agency psychological consultant, reviewed the evidence of record and assessed that Plaintiff's affected disorder[4] and anxiety-related disorder moderately affect activities of daily living, social functionality, and his ability to maintain concentration, persistence, or pace. (R. 101.) Dr. Britton determined that Plaintiff had no significant limitations in (1) remembering locations and work-like procedures; (2) understanding, remembering, and carrying out very short and simple instructions; (3) making simple work-related decisions; (4) asking simple questions or requesting assistance; and (5) maintaining socially appropriate behavior. (R. 104-06.) Plaintiff had moderate limitations in: (1) maintaining attention and concentration for extended periods; (2) performing activities within a schedule; (3) sustaining an ordinary routine without special supervision; (4) working in coordination with or proximity to others; (5) completing a normal workday, and workweek, without interruptions from psychologically-based symptoms; (6) interacting appropriately with the general public; (7) accepting instruction and responding appropriately to criticism from supervisors; (8) getting along with co-workers or peers; and (9) responding appropriately to changes in the work setting. (R. 105-06.) Dr. Britton concluded that Plaintiff was not disabled because he could follow simple instructions, adapt to supervision, and could adapt to infrequent changes in a simple work routine. (*Id.*)

According to the record, Plaintiff was able to engage in activities of daily living such as attend to his own personal hygiene, prepare simple meals, wash dishes, laundry, and socialize. (R. 201-05.) Additionally, Plaintiff was able to lift objects up to fifteen pounds, walk for one hundred yards at a time, independently use public transportation, vacuum, and sit without

---

[4] An "affected disorder" is a "disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: Depressive syndrome characterized by at least four of the following: Anhedonia or pervasive loss of interest in almost all activities, or appetite disturbance with change in weight, or psychomotor agitation or retardation, or difficulty concentrating or thinking." (R. 101.)

difficulty. (R. 41-42, 49, 54, 206.) Plaintiff was also able to follow written and/or spoken instructions, handle stress, and have workable relationships with authority figures. (R. 206-07.)

### C. Procedural Background

On February 18, 2010, Plaintiff filed a Title II application for DIB alleging disability as of June 6, 2008. (R. 181-87.) Plaintiff's alleged disability was based on epilepsy, left knee, and left shoulder conditions. (R. 213.) On February 3, 2011, the Commissioner denied Plaintiff's DIB claim initially and upon reconsideration. (R. 110, 124.) Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. 10-22, 135.) On June 29, 2012, ALJ Friedman determined that Plaintiff retained the Residual Functional Capacity ("RFC") to perform work, which existed in significant numbers in the national economy through his date last insured and, thus, was not entitled to DIB ("ALJ's Decision"). (R. 10-22.) On September 26, 2013, the Appeals Council denied Plaintiff's request for review. (R. 1-5.) Subsequently, on November 27, 2013, Plaintiff brought his disability insurance claims to be heard before this Court.

**LEGAL STANDARD**

This Court exercises plenary review of all legal issues on an appeal of a decision by the Commissioner of Social Security. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). This Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations omitted).

Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Importantly, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey*, 354 F. App'x at 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). However, if the factual record is adequately developed, "'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Daniels v. Astrue*, No. 4:08-cv-1676, 2009 WL 1011587, at *2 (M.D. Pa. Apr. 15, 2009) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The ALJ's decision may not be set aside merely because [a reviewing court] would have reached a different decision." *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x 475, 479 (3d Cir. 2007) (citing *Hartranft*, 181 F.3d at 360). This Court is required to give deference to the ALJ's findings if supported by substantial evidence. *Scott v. Astrue*, 297 F. App'x 126, 128 (3d Cir. 2008). Nonetheless, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." *Cruz*, 244 F. App'x at 479 (citing *Hargenrader v. Califano*, 575 F.2d 434, 437 (3d Cir. 1978)).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). Indeed, a decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

**DISCUSSION**

In determining claims for disability under the Act, the Social Security Administration ("SSA") utilizes a five-step sequential evaluation process. 20 C.F.R. § 416.920(a). If at any step, a disability determination is made, the evaluation ends. *Id*.

Step One

First, at step one, the ALJ must make a determination as to whether the individual is currently engaged in "substantial gainful activity." 20 C.F.R. § 416.920(b). If so, the individual is found to be not disabled. "Substantial gainful activity" involves performing significant and productive physical or mental activities with the intention of being compensated. 20 C.F.R. § 404.1532(b); *Chicager v. Califano*, 574 F.2d 161 (3d Cir. 1978).

As of June 6, 2008, the onset date of Plaintiff's claim, he has not been employed. Plaintiff reported that he spends most of his days watching television and consuming beer. (R. 204, 399-400.) He occasionally does chores within his apartment such as wash dishes, clean laundry, and vacuum with the assistance of his fiancée. (R. 201-05.) The ability to perform household chores does not prove that one could or has engaged in "substantial gainful activity." *Henderson v. Astrue*, CIV.A. 10-1638, 2011 WL 6056896 (W.D. Pa. Dec. 6, 2011); *see also Frakenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1998). Thus, from the alleged onset date of Plaintiff's disability through his date last insured, December 31, 2010, Plaintiff has not performed any "substantial gainful activities."

Steps Two and Three

Next, at step two, the ALJ must make a determination whether the individual suffers from a "severe impairment," or has a combination of impairments that is "severe." 20 C.F.R. § 416.920(c). If the individual does have a severe impairment or a severe combination of

impairments, the analysis proceeds to the next step. If not, the individual is not disabled. A "severe impairment" significantly limits one's physical or mental ability to do basic work. 20 C.F.R. § 404.1520(c). An individual suffers from a "severe impairment" if they are unable to engage in any "substantial gainful activity" for a continuous period of twelve (12) months or more. 42 U.S.C.A. § 423(d).

Here, ALJ Friedman considered Plaintiff's impairments "severe," but determined that "they are not attended, singly or in combination, with specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the Listing of Impairments under 1.00 (Musculoskeletal System), 11.00 ( Neurological) and 12.00 (Mental Disorders)." (R. 13.)

At step three, the ALJ compares the individual's impairments or combination of impairments against those impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the severity of the individual's impairments or combination of impairments meets or medically equals the criteria listed in Part 404, Subpart P, Appendix 1, and meets the duration requirement, then the individual is deemed disabled. If not, the analysis proceeds to the next step.

Here, the medical record supports ALJ Friedman's finding that Plaintiff suffered from epilepsy, degenerative disc disease, depression, anxiety disorder, and obesity. (R. 12.) ALJ Friedman found that these impairments could individually or collectively significantly have limited his ability to do one or more basic work activities continuously for at least twelve (12) months. (*Id.*)  However, ultimately, ALJ Friedman did not find Plaintiff's knee or left shoulder impairments severe. ALJ Friedman's analysis of the severity of Plaintiff's impairments should have further addressed evidence regarding the severity of Plaintiff's left knee and shoulder impairments.

Plaintiff is limited in activities requiring prolonged weight bearing, gross manipulations of the arm, lifting, carrying, and reaching due to his left shoulder condition. (R. 403.) Plaintiff could not push nor pull with his left arm and could not climb ladders, ropes, or scaffolds. (R. 103.) Plaintiff walked with a left antalgic limp, could not squat, and could not walk on his heels nor on his tiptoes. (R. 403.) On March 15, 2012, Dr. Goraya reported that Plaintiff had difficulty walking approximately 300 feet before experiencing knee pain and is unable to kneel, squat, or climb stairs. (R. 654.) Plaintiff had moderate limitations in performing activities within a schedule, sustaining an ordinary routine without special supervision, and completing a normal workday and workweek without interruptions from psychologically based symptoms. (R. 105-06.)

In order to qualify for a musculoskeletal impairment under Listing 1.00B(2)(a) one must show that

> Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months.

20 C.F.R. Part 404, Subpart P, App. 1, § 1.00B(2). Here, ALJ Friedman concluded that Plaintiff does not qualify for a musculoskeletal impairment because he is able to ambulate effectively and perform gross movements. "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00B(2)(b)(2). An " [i]nability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities;

i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Part 404, Subpart A, App. 1, § 1.00B(2)(c).

ALJ Friedman noted that Plaintiff is able to engage in daily living activities. (R. 201-05.) Additionally, he found that Plaintiff is able to lift objects up to fifteen pounds, walk for one hundred yards at a time, independently use public transportation, vacuum with the assistance of his fiancée, and sit without difficulty. (R. 41-42, 49, 54, 206.) Plaintiff does not need help dressing and can walk without the assistance of a walker or a cane. Although Plaintiff could not push nor pull with his left arm, the definition of gross movements requires both upper body extremities to have similar limitations. *See* 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00B(2)(c). ALJ Friedman determined that since Plaintiff is still able to perform activities of daily living he fails to qualify for musculoskeletal disability under Part 404, Subpart P, Appendix 1. 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00B(b)(2), (c), but does not clearly address Plaintiff's impairments including obesity.[5]

In order for an epilepsy condition to qualify as a neurological disability under Listing 11.02, seizures must "occur more frequently than once a month in spite of at least three (3) months of prescribed treatment." 20 C.F.R. Part 404, Subpart P, App. 1, § 11.02. On January 25, 2012, Dr. Crain indicated that the Plaintiff has seizures once every three months. (R. 499.) The medical record also indicates that Plaintiff often reported that he was not taking his prescribed medicine and went to the hospital regarding his seizures rather infrequently. (R. 399-400, 524, 590.) As such, ALJ Friedman found Plaintiff did not qualify for neurological disability under the criteria of Listing 11.02.

---

[5] Although ALJ Friedman did state in his decision that he considered obesity an analysis of the impairment was not provided. (R. 15, 20.)

ALJ Friedman further determined that the severity of Plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.04 and 12.06 in Part 404, Subpart P, Appendix 1. In order to qualify for mental disability one must suffer at least two of the following: "(1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpart P, App. 1, §§ 12.04, 12.06.

A marked limitation is present where the impairment interferes seriously with one's ability to "independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I). An extreme limitation is present where one's impairment "interferes very seriously with [one's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I); *Phifer ex rel. Phifer v. Comm'r of Soc. Sec.*, 84 F. App'x 189, 191 (3d Cir. 2003). A consultative examination for disability listed Plaintiff's restriction on completing daily living activities as moderate. (R. 105-06.) His activities of daily living consist of watching television and consuming beer. (R. 204, 399-400.) Plaintiff is able to dress himself and perform light chores within his apartment. (R. 201-05.)

Plaintiff's difficulties in maintaining social function and maintaining concentration were also described as moderate. (R. 105-06.) Plaintiff reported that he occasionally socializes and attends church with his fiancée. (R. 201-10.) Dr. Britton found that Plaintiff had moderate difficulties maintaining attention and concentration for extended periods, performing activities within a schedule, and sustaining an ordinary routine without special supervision. (R. 105-06.) Plaintiff is also able to watch television for extended periods of time. (R. 204.) ALJ Friedman concluded that Plaintiff's limitations in maintaining concentration, persistence, or pace are

moderate and do not qualify as a marked limitation, and his episodes of decompensation were not for an extended duration. *See* 20 C.F.R. § 416.926a(e)(3)(I); *Phifer ex rel.*, 84 F. App'x at 191.

Following the third step, the ALJ must identify the individual's RFC. An individual's RFC is their ability to do physical and mental work activities on a sustained basis despite limitations from their impairments. The ALJ considers all impairments in this analysis, not just those deemed severe. 20 C.F.R. §§ 416.920(e), 416.945; SSR 96-8p.

Here, ALJ Friedman determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(b).

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567. Evaluation of an individual's RFC requires consideration of all evidence in the case record. 20 C.F.R. § 416.920(e). ALJ Friedman considered Plaintiff's inability to stand more than two hours during an eight-hour workday. However, the ALJ did not provide a detailed analysis of all of Plaintiff's impairments and how they affect Plaintiff's ability to function in the workforce. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009). Plaintiff's mental impairments and obesity need to be specifically addressed, along with Plaintiff's other impairments, before this Court can conduct a meaningful review.

Steps Four and Five

In the instant matter, in order to proceed to steps four and five, ALJ Friedman must properly determine Plaintiff's RFC, considering his impairments. *See Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). At step four, ALJ Friedman must then determine whether

Plaintiff can return to his previous work. At step five, ALJ Friedman must consider whether Plaintiff is capable of adjusting to other work considering his RFC, age, education, and work experience. This Court will remands this matter for further clarification and review.

**CONCLUSION**

   For the reasons set forth above, this Court **REMANDS** this matter for further proceedings consistent with this Opinion.

                      s/Susan D. Wigenton, U.S.D.J.

Orig: Clerk
cc:  Parties